NOT DESIGNATED FOR PUBLICATION

No. 125,256

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHAWN P. ROSENBERG,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; JOSEPH L. MCCARVILLE III, judge. Submitted without oral argument. Opinion filed October 25, 2024. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Kimberly A. Rodebaugh*, senior assistant district attorney, *Thomas R. Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HILL, P.J., ATCHESON and CLINE, JJ.

HILL, J.: Here, a jury found that the facts proved that Shawn P. Rosenberg was guilty of several serious sex crimes. In this appeal, we must decide whether legally sufficient evidence was presented to this jury so it could find the accused guilty. We must also decide whether the omission of a certain jury instruction was reversible error.

Rosenberg appeals his convictions for three counts of aggravated indecent liberties with a child. He contends that his conviction for aggravated indecent liberties with a child younger than 14 was unsupported by the evidence because the State failed to prove the

1

child's age at the time of the crime. Rosenberg also argues that the court should have given the jury a unanimity instruction because, in his view, two of the charges were based on multiple acts—each of which could provide the basis for a conviction. Thus, he contends that his convictions were multiplicitous and must be reversed.

*A parent sexually abuses his two daughters.*

We will use pseudonyms to replace the names of the two girls who were abused by Rosenberg. See Kansas Supreme Court Rule 7.043(c)(2) (2024 Kan. S. Ct. R. at 50).

Over the course of about 15 years, Shawn Rosenberg sexually abused both his stepdaughter, Megan, and his biological daughter, Susan. Rosenberg began sexually abusing Megan when she was 5 or 6, continuing until she was 19. After Megan moved out of the house, Rosenberg turned to his 13-year-old daughter, Susan, and renewed his cycle of escalating sexual abuse. His indecencies remained hidden in the family over the years. Neither sister reported their abuse until a time when Susan was forced to undergo a psychological evaluation. That interview proved to be the catalyst that exposed Rosenberg's crimes to law enforcement officers. This prosecution is based on Susan's disclosures she made in that forensic interview. She also testified at trial.

*A psychological evaluation led to the exposure of decades of sexual abuse.*

Susan grew up in St. John but moved with her family to South Hutchinson in July 2015 when she was 12 years old. Susan was happy and excited about the move, though her general demeanor was shyer and more reserved. Susan's behavior began to change after the move. Around the time when Susan was 13 years old, in 2016 or 2017, she began to wear hoodies and had headphones playing loud music and started flunking a lot of her classes. Susan's mom testified about an incident where Susan came home with

2

claw marks on her arms but would not talk to her mom about what caused the marks. Her mom also observed that Susan became clingier and stayed by her mom's side more.

Near the end of 2017, Susan went to the doctor because she was having some health issues. At the doctor's visit, Susan filled out a depression screening questionnaire. Her score was high enough to raise such a concern that the doctor had Susan see a counselor that same day. Susan began seeing a therapist regularly and kept a journal that her mom told her to hide. Later, Susan's mom saw the journal sitting on top of a toolbox inside Susan's room and read an entry in the back of the journal that began, "If this is not mom . . . ." Her mom realized that the entry was Susan's suicide note. The note indicated that Susan had chosen the date and the means by which she planned to take her life—antidepressant pills—and the location of the pills. After reading the note, her mom found the pills and got rid of them and then called Susan's counselor. This resulted in Susan attending weekly counseling. Susan did not give the date that she would end her life in the suicide note, but she was looking forward to a Girl Scouts trip to Europe that was planned for July 2018.

Sometime in Susan's counseling sessions, she disclosed that she was hearing voices and seeing shadows, which concerned her counselor enough to recommend that Susan see a specialist and undergo a psychological evaluation. Susan and her mom attended the evaluation, which took place the week after Susan's Girl Scouts Trip. Susan was handling the evaluation okay until the evaluator told her that the voices and the shadows could be due to a trauma. He also explained what types of traumas, such as a car wreck, a death in the family, or any kind of physical abuse, could be the cause. Susan started crying and said that Rosenberg used to hit them. Susan was referring to Rosenberg, who she said had physically abused her and her siblings.

Susan's mom was very concerned about the disclosure. She feared a reporting to child protective services because that could cause her to lose custody of her kids. After

the evaluator wrote his report, Susan and her mom went home. In the car ride home, Susan told her mom that the evaluator asked about her sexual relations. Her mom thought that questions about Susan's sexual relations were strange because Susan never had a boyfriend, nor did she ever show any interest in boys.

Two days later, Susan's mom called her eldest daughter, Megan, and asked her to meet to discuss the evaluation. They discussed Susan's disclosure during her evaluation that Rosenberg physically abused Susan and her siblings. Megan told her mom, "That's not all he did." Hearing Megan's response immediately sent her mom rushing home because she remembered Susan was home alone and wanted to talk to her. Her mom testified that there was not "a question in [her] mind of whether it was true or not. [She] just immediately knew" that Megan was telling the truth. While driving home, memories plagued Susan's mom. She remembered a time when she walked into Megan's room at 2:00 in the morning and saw Rosenberg, wearing only his underwear, on Megan's bed, with Megan in the bed. She then recalled that she looked to see if Rosenberg had an erection.

Once home, Susan's mom found Susan laying in her parents' bed. Her mom sat beside her and said she needed to know if Rosenberg ever touched her inappropriately. Susan apprehensively answered affirmatively. Her mom's worst fears were confirmed and she went outside to call Megan and tell her that Rosenberg touched Susan inappropriately. Megan's only response was, "He promised." Her mind racing, Susan's mom began planning how she was going to get Rosenberg out of the house and protect her kids from any more abuse by him. Worried about Susan's mental state, her mom chose to take Susan to Horizons Mental Health Center to talk to a forensic interviewer rather than going straight to the police.

At Horizons, Susan met with Jane Holzrichter, the director and forensic interviewer with Horizons' Child Advocacy Center. During the interview, Susan

4

disclosed that Rosenberg had inappropriately touched her and had raped her. She said that the first instance of sexual touching began when she was 13 years old and continued for about 2 years. She added that the touching escalated to rape and disclosed that Rosenberg used his fingers to touch her inside her vagina and later used his penis to rape her. During the trial, Susan testified that at the start, Rosenberg sexually assaulted her once every month or two, but the assaults eventually increased to several times a week.

*Rosenberg escalates his sexual abuse to rape.*

During her forensic interview, Susan disclosed the first time Rosenberg raped her. Her description follows:

> "[M]y dad's name is Shawn Rosenberg, it started about a year ago or so, like one time, he took me to Great Bend, because he has a house in Great Bend. And I was going to spend the night there before my cousin . . . before she was going to spend the night. Like we went to Great Bend, like stay there before she was going to spend the night. And then he got me drunk that night. And then he raped me that night."

She said that she was not too sure what happened, but she remembered that she woke up naked next to Rosenberg. She thought that she was 14 years old when it happened because she remembered that school was out. Susan said that the Great Bend incident happened over summer break during 2017.

Susan testified that Rosenberg owned a house in Great Bend and she often went with Rosenberg and her brother to the house for fun. This time, the plan was for Susan and Rosenberg to go down to the house for two nights, and Susan's cousin would join them on the second night. But when Susan was all alone on that first night, Rosenberg seized the opportunity and escalated his sexual assault by raping Susan.

5

Rosenberg told Susan that he wanted to get her drunk, and he gave 15-year-old Susan Smirnoff Ice. Then, they just hung out and played Cards Against Humanity while drinking. Soon, Rosenberg took off his clothes and told Susan that he used to do it all the time as a kid. He told Susan that she should take off her clothes. She did. They continued playing the game while naked for a while before laying down in the only bedroom at the house.

While in bed, Rosenberg began touching Susan's breasts and vagina, initially using his hands. He got out a condom and instructed Susan to put it on his penis. After Susan put the condom on Rosenberg's penis, he inserted it into her vagina. Susan could not remember how long Rosenberg raped her, but remembered that after he was done, Rosenberg told her to shower before going to bed.

*This abuse pattern repeats.*

Another instance of sexual abuse occurred some months after Susan's 15th birthday. Susan turned 15 on June 13, 2018. She testified that she awoke to Rosenberg sitting on her bed, telling her that he wanted to show her something in the garage. She followed him to the garage and sat down on the couch.

In the garage, Susan's father raped her a second time. Rosenberg walked over to the couch and began taking off Susan's clothes. Then Rosenberg took off his own clothes. Next, he touched Susan's breasts and vagina, with his hands and then his penis. Rosenberg rubbed his penis on Susan's vagina before inserting it inside her vagina, while he touched her breasts with his hand. Susan testified that she just sat there until he withdrew and told her to get dressed and go inside. She immediately did as she was told and ran to her room and cried. Susan testified that Rosenberg did not use a condom and did not recall seeing anything come out of his penis. This was the last time Rosenberg sexually abused Susan.

In July 2018—one month after she was raped in the garage—Susan went on the Girl Scouts trip to Europe with her sister, Megan. After the girls returned home, Susan went in for her psychological evaluation, and both sisters disclosed their nearly combined 15 years of sexual abuse by Shawn Rosenberg.

*Rosenberg, charged with three counts of aggravated indecent liberties with a child, is tried by a jury.*

Based on the sisters' disclosures, the State charged Shawn Rosenberg with the following:

1. Aggravated indecent liberties with a child younger than 14, an off-grid person felony, which occurred between June 13, 2016, and June 12, 2017;
2. Aggravated indecent liberties with a child between the ages of 14 and 16, a severity level 3 person felony, which occurred between June 13, 2017, and June 12, 2018; and
3. Aggravated indecent liberties with a child between the ages of 14 and 16, a severity level 3 person felony, which occurred between June 13, 2018, and July 9, 2018.

At the jury trial several witnesses testified: Susan and Megan; their mom; Jane Holzrichter, the director of Horizon's Child Advocacy Center who interviewed Susan; and Detective Jake Graber. The defense presented testimony from Sharon Ceja, a DNA analyst for the KBI who testified about the lack of DNA or physical evidence found in this case.

The elements instruction given the jury read:

"In Count One, Shawn Rosenberg is charged with aggravated Indecent Liberties with a Child-Child Less than 14 years of age when the defendant is 18 or more years of

7

age. Shawn Rosenberg pleads not guilty. To establish this charge, each of the following claims must be proved:

"1. The defendant engaged in lewd fondling or touching of A.N.R.

"2. The defendant intended to arouse or satisfy the sexual desire of the child or the defendant or both.

"3. At the time of the act, A.N.R. was less than 14 years old. The State need not prove the defendant knew the child's age.

"4. The defendant was 18 or more years old at the time the act occurred.

"5. This act occurred on or between the 13th day of June, 2016, and the 12th day of June, 2017, in Reno County, Kansas.

"'Lewd fondling or touching' means fondling or touching in a manner which tends to undermine the morals of a child and is so clearly offensive as to outrage the moral senses of a reasonable person. Lewd fondling or touching does not require contact with the sex organ of one or the other."

The trial court also instructed the jury that:

"Each crime charged against Shawn Rosenberg is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged."

The court did not give the jury a unanimity instruction and neither side requested it be given. The jury returned a guilty verdict on all three charges. Rosenberg is currently serving his prison sentence.

Rosenberg raises two issues on appeal. First, he attacks the sufficiency of the evidence proving Susan's age. Next, Rosenberg argues that the trial court's failure to give a unanimity jury instruction was clearly erroneous, warranting reversal of two of his convictions.

8

*Did the State prove Susan was younger than 14 years old when Rosenberg defiled her?*

On the charge that carries the longest sentence, the State had to prove that Susan was younger than 14 years old when the crime was committed. Rosenberg now argues that there is insufficient evidence proving her age and that his conviction for that count must be overturned. He maintains that the testimony proving her age was inconsistent. The State, of course, argues to the contrary.

Appellate courts are from time to time asked to review such questions. But we are not jurors. We are not called on to determine guilt or innocence; instead, we must review the record for legal sufficiency of the evidence.

We review such sufficiency challenges in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. A reviewing court must neither reweigh evidence, nor resolve conflicts in the evidence, nor pass on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). The burden on the challenging party is a high one, and "only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt" will a court reverse such a verdict. *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020). Thus, Rosenberg must show us that no reasonable juror here would have concluded that Susan was under the age of 14 when Rosenberg lewdly fondled and touched her.

Our search of this record is guided by well-established legal principles. A verdict may be supported by circumstantial evidence if the evidence provides a basis for a reasonable inference by the jury regarding the fact in issue. To be sufficient, circumstantial evidence need not exclude every other reasonable conclusion. *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021). A conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Pattillo*, 311 Kan. 995,

9

1003, 469 P.3d 1250 (2020). But see *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017). There is no legal distinction between direct and circumstantial evidence in terms of their respective probative value. *Aguirre*, 313 Kan. at 209.

*Susan's statements were not always consistent.*

Susan was born on June 13, 2003. Thus, Susan was 13 years old from her birthday in 2016 until her birthday in 2017. Susan also would have been in 8th grade during the fall of 2016 through spring of 2017. Susan was 15 years old when she sat down with Jane Holzrichter at Horizons Child Advocacy Center in August 2018.

In that interview, Susan believed that the first time Rosenberg touched her occurred in her bedroom when she was 13 years old. She told Holzrichter that the touching "started about a year ago or so." She recalled that she was 14 years old the first time Rosenberg raped her at the house in Great Bend because she remembered that school was out for summer break in 2017. Susan also said that the second time Rosenberg raped her happened when she was 15 years old.

Susan testified at trial that she thought the first instance of sexual abuse occurred when she was 14 years old. The video recording from Susan's interview with Holzrichter was submitted into evidence. Rosenberg's trial took place in 2022 when Susan was 18.

Because Susan's forensic interview was closer in time to Rosenberg's fondling and touching than her statements in court given three years later, a rational juror could conclude that Susan's memory would be more accurate in her earlier interview rather than her trial testimony six years after the crime. The jury heard evidence that Susan's behavior changed as she *began* 8th grade in 2016. Thus, a rational juror could have reasoned that Susan's noticeable change in behavior began in 2016 when Susan was the age of 13. After all, this change started when she began the 8th grade.

10

This jury heard evidence which could lead a rational fact-finder to find Rosenberg guilty beyond a reasonable doubt for aggravated indecent liberties with a child younger than 14. Viewed in a light most favorable to the State, we will only reverse a conviction if the evidence is such that no reasonable fact-finder could find Rosenberg guilty beyond a reasonable doubt. That is not the case here. The evidence submitted to the jury was sufficient to find that Susan was 13 years old at the time of the first incident of touching. This appellate issue offers no support for relief.

*Should we reverse because the court failed to give a unanimity instruction?*

Rosenberg argues that his conviction for lewd touching of Susan when she was 13 years old and his conviction for sexual intercourse with Susan when she was 14 years old must be overturned because the trial court failed to give a unanimity jury instruction. In his view, both convictions are flawed because there was evidence presented to the jury of different sexual acts that could serve as a basis for each conviction. He argues that failing to instruct the jury it had to be unanimous on which acts he committed warrants reversal because different jurors could have relied on different acts to find him guilty.

This issue calls for some explanation. A jury verdict must, by law, be unanimous. That simply means that to find an accused guilty, each juror must agree about what an accused did. But many crimes in Kansas can be committed in different ways. To ensure this jury unanimity, when a prosecution presents evidence of different acts that jurors could find to be a crime, either of two steps can prevent any doubts about the unanimity of the jury. First, the State may choose which acts done by the accused were the basis for the crime charged and tell the jury of that choice. Or, second, the court can instruct the jury that it must all agree on which acts were committed by the accused. Otherwise, a guilty verdict may arise as a result of some jurors finding the accused guilty of one act while other jurors could find the accused guilty of a different act. Such a divided multiple act verdict is not unanimous and is not legal.

The State did not elect which acts Rosenberg performed are the basis of the charges. Neither party requested the unanimity instruction and none was given. Thus Rosenberg's challenge to the omitted instruction is reviewed under a clearly erroneous standard. See *State v. Voyles*, 284 Kan. 239, 253, 160 P.3d 794 (2007).

The right to a unanimous jury verdict in Kansas is guaranteed by statute. K.S.A. 22-3421; K.S.A. 22-3423(1)(d). In 2020, the United States Supreme Court held that the Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees criminal defendants the right to a unanimous jury verdict at least in felony cases. *Ramos v. Louisiana*, 590 U.S. 83, 93, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020). When a verdict is challenged, we exercise unlimited review and determine whether the case presents a multiple acts issue. See *State v. Foster*, 290 Kan. 696, 713, 233 P.3d 265 (2010); see also *Voyles*, 284 Kan. at 248.

In multiple acts cases where the State failed to elect the act on which the jury should rely on to find the defendant guilty and the trial court failed to give an instruction that the jury must unanimously agree on the underlying acts for each conviction, our appellate courts have—at times—found reversible error.

If we find error either by the State's failure to elect or the district court's failure to instruct, our next step is to determine whether the error was reversible. *State v. Smith*, 317 Kan. 130, 136, 526 P.3d 1047 (2023). If the challenged jury instruction was not requested during trial, the assertion of an instructional error on appeal is reversible only if failing to give the instruction was clearly erroneous. *State v. Butler*, 307 Kan. 831, 845, 416 P.3d 116 (2018). This rule applies to constitutional errors as well. *State v. Reynolds*, 319 Kan. 1, 18, 552 P.3d 1 (2024). While the clearly erroneous analysis is not a standard of review, it does supply the basis for determining whether a trial error warrants reversal of a conviction. *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014).

12

*We must take Rosenberg's defense into account.*

Rosenberg's defense that he raised at trial is significant here. Rosenberg simply claimed at trial that the incidents did not happen. In other words, his defense was simply a denial. When a defendant presents a unified defense or a general denial of the criminal acts of the charged crime, the district court's failure to instruct is not reversible under the clearly erroneous standard. *Voyles*, 284 Kan. at 253. Absent such defense or denial, the reviewing court will reverse only if they are firmly convinced that there is a real possibility the jury would have returned a different verdict if the instruction had been given. 284 Kan. at 253. That means we must be firmly convinced that there was a real possibility that this jury would have returned a different verdict had the unanimity instruction been given.

This ruling is reasonable because with a general denial defense, there is a reduced chance of jury uncertainty. Any error becomes harmless. "Based upon careful scrutiny of appellate case law addressing this issue in similar situations, harmless error must ultimately be determined from an examination of whether the defendant has presented separate defenses to any of the acts alleged." *State v. Voyles*, 34 Kan. App. 2d 110, 116, 116 P.3d 720 (2005).

*What is the significance of the court's failure to respond to the jury's question?*

During jury deliberations, one of their questions asked was, "We heard of multiple instances of 'lewd fondling or touching.' Why is there only one charge? no. 8 (Verses the isolated no. 9 and no. 10)?"

The jury was referring to Instruction No. 8, which contained the elements instruction for count one for aggravated indecent liberties with a child younger than 14. The court told the jury, "You have all of the evidence that you're going to get and you

13

have the court's instructions and it's your job to figure this out." With that, the trial court sent the jury back into deliberations; they reached a verdict the following day.

The presence of this jury question raises some concern with the jury's verdict on count one and whether the jury unanimously agreed on the act supporting the conviction. We find no good reason for the judge to brusquely answer the jury's question as it did. To us, it was the perfect opportunity to give the jury the unanimity instruction.

Even so, the evidence may support only one act of lewd fondling or touching that occurred when Susan was 13 and thus, count one would not involve multiple acts.

Caselaw raises cautionary flags. In *State v. Santos-Vega*, 299 Kan. 11, 14, 321 P.3d 1 (2014), the defendant was charged with two counts of rape and two counts of aggravated indecent liberties with a child younger than 14. The jury acquitted on the rape charges but convicted the defendant on the remaining two counts. On appeal, the defendant argued that the victim of his two convictions testified to three distinct acts, any of which could have formed the basis for his convictions. Our Supreme Court agreed that there was a multiple acts problem and held that failing to give a unanimity instruction was erroneous. *Santos-Vega*, 299 Kan. at 18.

On whether that error was reversible, the court noted:

"The parties correctly recognize error occurred because the State did not inform the jury which act to rely upon in its deliberations to convict Santos-Vega on each count of aggravated indecent liberties and the district court failed to give a unanimity instruction. These failures are particularly noteworthy in this case because *during its deliberations the jury actually questioned why Santos-Vega was charged with two offenses when the testimony showed S.T. was fondled three distinct times*. Inexplicably, *the district court simply referred the jury back to the original written instructions without addressing the jury's actual inquiry*." (Emphasis added.) *Santos-Vega*, 299 Kan. at 18.

14

The court emphasized that the district court failed to remedy the jury's confusion:

"The jury's question should have triggered recognition that a multiple acts problem presented itself and that a unanimity instruction was an appropriate response, which would have had no adverse consequences on review. These circumstances leave us with the only remaining question whether there was clear error as defined in our caselaw." *Santos-Vega*, 299 Kan. at 18-19.

The court ultimately did not reach the issue of reversibility on the unanimity error alone because a second error at trial was of a "substantial magnitude combine[d] with the unanimity error to compel reversal for a new trial." 299 Kan. 20-21. Concluding that cumulative error deprived the defendant of a fair trial, the court highlighted the aggregated errors: a *Doyle* violation—"complete with the detective's histrionic emphasis—*and the lack of unanimity between the evidence and the charges being deliberated, which remained unexplained despite the jury's obvious confusion.*" (Emphasis added.) *Santos-Vega*, 299 Kan. at 22. The *Santos-Vega* opinion is a cause for concern, but it does not compel us to reverse.

*We are not convinced that this claimed error is reversible.*

We have several reasons why we are not convinced. First, a close reading of the jury question, "Why is there only one charge," itself leads to the interpretation of the question that the jury was merely asking why more charges were not filed against Rosenberg. If that is correct then it is not a question showing jury confusion but rather is a question simply seeking information.

Next, in the final analysis of this issue, the evidence supports only one act of lewd fondling or touching that occurred when Susan was 13 and thus, count one does not involve multiple acts.

15

Finally, the State conceded that the jury heard evidence of multiple acts for counts one and two. Though the evidence suggested there were multiple acts, the State argues each act was orally elected for each count during closing argument. As to the first count, the State argued to the jury that the incident where Rosenberg touched Susan

"on the breasts, that he touched her on her vagina, and these incidents began in her bedroom in the house in South Hutch and that Shawn Rosenberg intended to arouse or satisfy the sexual desires of the child in question, [Susan], or himself, or both. She described freezing as he touched her breasts and touched her vagina."

Then, the State defined lewd fondling or touching as reflected in the instructions and stated:

"Here we did have contact with [Susan's] sex organ and she did indicate—she testified to you that she felt shame, that she felt—cried after that and the state would constitute that this does include lewd fondling, touching of [Susan], and that Shawn Rosenberg was eighteen or more years of age after that. We also know that when [Susan] talked with Jane Holzrichter, she believed that the touching, the incidents with the touching, that she was thirteen years old at the time and she would have been thirteen between the dates of June 13th, 2016, and June 12th, 2017."

On the second count, the State pointed to the incidents in the master bedroom where Rosenberg engaged in sexual intercourse with her by using his fingers to digitally penetrate Susan's vagina when she was 14. The State argued to the jury:

"Well, we heard [Susan] testify about incidents that occurred in the master bedroom of that residence and in describing that she believed she was fourteen years old at the time and she also testified that he inserted his fingers into her vagina which would constitute the definition of sexual intercourse."

16

Additionally, Detective Graber testified that there were three main incidents of various degrees of touching that Susan disclosed. The first incident occurred in her bedroom when her mom was at work. In the first incident, there was no penetration of Susan's vagina and only involved touching Susan's breasts and the outside of her vagina.

This initial touching when she was 13 years old occurred around the time when her half-sister noticed the great change in Susan's demeanor. This was around the time when Susan began to wear hoodies and had headphones playing loud music and started flunking a lot of her classes. Susan's mom testified about an incident where Susan came home with claw marks on her arms but would not talk to her mom about what caused the marks.

The nature of the jury question, Rosenberg's general denial, the nature of his acts when Susan was 13 years old, and the testimony about Susan's reaction when she was 13 years old all point in one direction. All of these reasons lead us to hold that we are not firmly convinced that the verdict would have been different had the unanimity instruction been given.

Rosenberg has failed to convince us to reverse his convictions on both issues.

Affirmed.